Filed 7/28/26  P. v. Ruiz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084909 |
| v. | (Super.Ct.No. FVI18003056) |
| NICOLAS RUIZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Zahara T. Arredondo, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Robin Urbanski and Anastasia Sagorsky, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant was convicted by a jury of assault on a peace officer with a semiautomatic firearm.  (Pen. Code, § 245, subd. (2).)[1]  Defendant appeals, arguing only that his conviction must be reversed because the trial court abused its discretion when it admitted evidence that defendant bore tattoos depicting or referring to firearms.  We find no prejudicial error and affirm the judgment.

## II.  BACKGROUND

A.  *Facts and Charges*

In October 2018, San Bernardino County Sheriff's deputies were conducting a traffic stop on Bellflower Street in the City of Adelanto when they heard the sound of gunshots from a nearby apartment complex (the apartments).  Deputies went to investigate the source of the gunfire.  After knocking and announcing themselves at one of the apartment units, a gunshot came through the window next to the apartment door and hit one of the deputies.

As a result of this incident, defendant was charged with premeditated attempted murder (count 1; §§ 664, 187, subd. (a)(1)); assault on a peace officer with a semiautomatic firearm (count 2; § 245, subd. (d)(2)); grossly negligent discharge of a firearm (count 3; § 246.3, subd. (a)); and prohibited possession of a firearm by a felon (count 4; § 29800, subd. (a)(1)).  The information also alleged that defendant personally used a firearm, personally and intentionally discharged a firearm, and caused great bodily

---

[1]  Unlabeled statutory citations refer to the Penal Code.

2

injury in discharging a firearm in the commission of count 1 and count 2 (§ 12022.53, subds. (b)-(d)). Finally, the information alleged eight aggravating factors in the commission of the offenses pursuant to section 1170, subdivision (b)(2).

B. *Pretrial Motions and Proceedings*

Count 3 was dismissed on the People's motion, and defendant pled guilty to count 4 (felon in possession of a firearm) prior to trial.

During pretrial motions in limine, the prosecutor sought permission to admit several photographs of defendant. As relevant to this appeal, one photograph (exh. 8) depicted defendant facing the camera wearing a sleeveless shirt that exposed numerous tattoos on defendant's arms. Two other photographs (exhs. 9, 11) depicted an enlarged view of defendant's right shoulder, which bore a tattoo reading: "Pistolero hasta Muerte." A fourth photograph (exh. 15) depicted an enlarged view of defendant's left shoulder, which bore a tattoo depicting a mariachi band member holding two revolvers. Defense counsel objected to the admission of each of these photographs on the ground that the evidence should be excluded under Evidence Code section 352 as more prejudicial than probative. And the trial court overruled this objection as to these photographs.

B. *Relevant Evidence at Trial*[2]

    1. Testimony of Sheriff's Deputies

Multiple deputies working with the San Bernardino County Sheriff's Department testified at trial regarding the incident. On the night of the incident, four deputies were working together to conduct a traffic stop approximately half a mile from the apartments when the deputies heard multiple gunshots. The deputies were dressed in full uniform and were traveling in vehicles marked "Sheriff" and equipped with red and blue signal lights.

Upon hearing the gunshots, the deputies decided to investigate the source of the gunfire. One deputy parked his patrol vehicle on the street approximately 15-20 feet away from the apartments, while two other deputies conducted an area check around the perimeter of the apartment complex.

The two deputies conducting the area check did not observe anything of significance and decided to continue patrolling the area. While doing so, they conducted a second traffic stop on Bellflower Street "right across the street" from the apartments. The overhead red and blue flashing lights, as well as all of the other lights, on their patrol vehicle were activated. This traffic stop occurred approximately 75-100 feet from the apartment unit where defendant was eventually located. As the deputies approached the

---

[2] Because defendant was convicted only of assault on a peace officer with a semiautomatic firearm (count 2; § 245, subd. (d)(2)) and challenges only the admission of evidence related to his tattoos as error, we summarize only the evidence relevant to consideration of this claim.

vehicle they had stopped, gunshots were fired in their direction from the vicinity of the apartment building. The deputies immediately asked the stopped driver to leave and took cover behind other vehicles parked on the street.

The two deputies on patrol waited approximately 25 minutes for the other two deputies in the area to return as backup. All four deputies then proceeded to enter the apartments. Within the apartment complex, the front door to each apartment unit opened up to a shared interior courtyard. The courtyard was dimly lit at the time.

The deputies initially approached the apartment unit next door to the unit where they eventually encountered defendant. One of the deputies knocked loudly on the door of the apartment unit with his flashlight, verbally announced he was from the sheriff's department, and directed the occupants to open the door. The knock and announce procedure was captured on video by a deputy's body-worn camera and played for the jury. After contacting the occupants of the first apartment unit, deputies determined that they were not the source of the gunfire and proceeded to the next apartment unit.

As deputies approached the second apartment unit, a law enforcement helicopter arrived and could be heard circling overhead. Deputies performed the same knock and announce procedure at the second apartment unit. Before deputies had a chance to knock a second time, a gunshot came from the window beside the apartment door, hitting one of the deputies. The knock and announce procedure, as well as the gunshot, was captured on video by a deputy's body-worn camera and played for the jury.

The injured deputy exited the apartment complex while the remaining deputies retreated and began yelling commands for the occupants of the apartment unit to come

5

out.  Four individuals eventually exited the apartment unit:  defendant, a second male occupant, a female occupant, and a young child.

2.  Testimony of Female Occupant

J.M. testified that, at the time of the incident, she was in a romantic relationship with defendant.  At the time of the incident, she lived in the apartments with her young son and defendant, and one of defendant's friends had recently come to visit.  J.M. testified that, on the evening of the incident, defendant appeared "panicky," looking out the window, checking his phone, and saying that someone was trying to find him.

J.M. was unaware that defendant had a firearm until she heard him discharge the firearm the evening of the incident.  She reacted by telling defendant to stop.  Defendant prevented her from leaving the apartment, so she took her son into a closet and called 911.  However, she did not specifically tell dispatch that there was a man in her apartment with a gun out of fear of defendant's reaction.  Instead, she generally reported there had been gunshots fired at the apartments, as well as suspicious activity in a vehicle outside the apartment complex, in the hope that law enforcement would arrive at the scene.  While inside the closet with her son, she continued to hear many additional gunshots and eventually heard a police helicopter overhead.

During J.M.'s testimony, the prosecutor displayed exhibit 8.  J.M. was asked only to confirm that exhibit 8 accurately depicted defendant.  The prosecutor also displayed exhibit 11 and asked J.M. to translate the tattoo depicted in the photograph.  J.M. expressed the belief that "Pistolero hasta la muerte" should be translated as "gunman till death."

6

3. Testimony of Neighbor

J.J. testified that he was living in the apartment unit first visited by the deputies on the night of the incident. On the night of the incident, he heard gunshots that sounded very close, looked out the window of his apartment unit, and observed law enforcement officers conducting a traffic stop outside on the street. He could clearly see the sheriff's deputies and patrol vehicles with flashing lights from his window. He recognized the vehicles as law enforcement vehicles by their appearance and flashing lights. He also recorded a video from his apartment window depicting the traffic stop, which was played for the jury.

Less than 40 minutes after hearing the gunshots, deputies knocked on the door to his apartment unit. He could recognize they were law enforcement officers "by their outfits, what they were wearing." After speaking with the deputies, he heard a single shot fired from the apartment unit next door. He was "certain" the gunshot came from the apartment unit next to his unit because there were no other apartments in the complex in the direction from where the shots came. As he observed officers making their way toward the apartment next door, he was still able to see their uniforms.

4. Defendant's Interview with Law Enforcement

A sheriff's sergeant assigned to investigate homicides testified that defendant waived his *Miranda*[3] rights and agreed to be interviewed by a sheriff's deputy after the incident. Defendant did not appear confused and was cooperative and alert.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

7

While speaking with this sergeant, defendant volunteered that he had shot the deputy who was injured during the incident. Defendant expressed the belief that he was being targeted by the "Mexican Mafia," explained that he purchased a firearm to protect himself, and further explained that he was visiting his girlfriend at the time of the incident in an effort to hide from his pursuers.

During this interview, defendant admitted that, on the night of the incident, he: (1) discharged his firearm multiple times; (2) observed sheriff's deputies in the area on at least two occasions prior to the incident; (3) specifically saw deputies conduct a traffic stop outside the apartments; (4) fired shots at the deputies conducting the traffic stop from the window of his apartment; (5) knew J.M. had called 911 prior to deputies arriving at the apartment; (6) heard what he believed to be law enforcement officers speaking over their radios outside the apartment; (7) heard what he believed to be a law enforcement helicopter circling above the apartment; and (8) knew that law enforcement personnel had entered the apartment complex.

While speaking with the sergeant, defendant also made contradictory statements regarding his intentions the night of the incident. Initially, defendant stated that he saw law enforcement personnel among a mob of other people and discharged his firearm to get their attention to help him. Defendant later made statements suggesting he believed that sheriff's deputies were cooperating with the Mexican Mafia. And still later, defendant denied knowing that law enforcement officers were outside his apartment when he discharged his firearm. At the time of the interview, defendant denied ingesting methamphetamine but admitted to consuming alcohol.

8

5. Defendant's Testimony at Trial

Defendant testified in his own defense at the time of trial. Defendant admitted he: (1) had prior felony convictions for "possession of a controlled substance, firearm, and suspended driver's license"; (2) was on probation at the time of the incident and faced three years in prison if found in violation of his probation; (3) had owned guns in the past and enjoyed shooting as a pastime; and (4) had previously helped a friend sell methamphetamine in exchange for a free share of the drugs.

Defendant testified that at the time of the incident, he was afraid that the "Mexican Mafia" was looking for him. He had purchased a firearm approximately one week before the incident. Contrary to the statements made during his interview with a sheriff's sergeant, defendant admitted that on the date of the incident he had ingested four or five lines of methamphetamine.

According to defendant, he observed a suspicious vehicle parked outside the apartments on the night of the incident. As a result, he instructed his girlfriend to call the police, told her not to leave the apartment, and instructed her to go hide in a closet. He used his gun to shoot out the window to "scare the Mexican Mafia away." Later, defendant observed law enforcement conducting a traffic stop outside the apartments on Bellflower Street. However, he also believed he saw "Mexican Mafia" people "coming towards" his apartment window, so he used his gun to shoot out the window to "get them scared so they can leave." Defendant admitted that, after he fired his gun, he observed the law enforcement officers end their traffic stop and "let the car go," but the the officers "disappeared" after that.

9

Approximately 30 minutes later, defendant heard a helicopter overhead. Defendant admitted that upon hearing the helicopter, he formed the belief that law enforcement had arrived in the area. He saw a shadow outside the apartment window, believed it was an individual from the Mexican Mafia, and fired a single shot out the front window of the apartment. However, defendant claimed he did not intend to shoot at any individual but was instead trying to get the attention of the helicopter. He denied his prior statements that he had seen individuals with flashlights and heard voices talking over a radio from the courtyard. Defendant also denied any knowledge that law enforcement personnel were inside the apartment complex, denied any intent to shoot at a deputy, and claimed he was unable to perceive things accurately because he was under the influence of methamphetamine.

With respect to his tattoos, defendant was asked about a specific tattoo depicted in exhibit 9, which read "Sucio by KOG," and explained that it was in reference to "a clothing brand trend." Defendant was also asked about the tattoo depicted in exhibit 11, which read, "Pistolero hasta la Muerte," and indicated that it meant "gunman until death." Finally, defendant was asked about a tattoo depicted in exhibit 15 and explained it was a "charro" or "mariachi type" holding two revolvers, which he agreed to have placed because it "looks cool." Defendant explained that all his tattoos were given to him by a friend who wanted to practice tattooing in preparation for starting a new business.

C. *Verdict and Sentence*

The jury failed to reach a verdict on the premeditated attempted murder charge (count 1; §§ 664, 187, subd. (a)(1)), and the trial court declared a mistrial on that count.

10

However, the jury found defendant guilty of assault on a peace officer with a semiautomatic firearm (count 2; § 245, subd. (d)(2)) and also found true the special allegations that defendant used a firearm, personally and intentionally discharged a firearm, and proximately caused great bodily injury in the commission of count 2 (§ 12022.53, subds. (b)-(d)).  The trial court also found true seven of the circumstances in aggravation alleged in the information.

The trial court sentenced defendant to the aggravated determinate term of nine years in state prison for the assault (count 2; § 245, subd. (d)(2)), enhanced by a consecutive indeterminate term of 25 years to life for the personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)).[4]  The trial court also sentenced defendant to a consecutive determinate term of eight months for the prohibited possession of a firearm (count 4; § 29800, subd. (a)(1)), representing one-third the middle term.  Defendant appeals.

### III.  DISCUSSION

On appeal, defendant raises a single claim that the trial court erred by admitting photographs depicting his tattoos as evidence.  As we explain, we find no prejudicial error and affirm the judgment.

A. *General Legal Principles and Standard of Review*

Generally, an assault is " 'an unlawful attempt, coupled with a present ability, to

---

[4]  The remaining firearm enhancements were stayed pursuant to section 12022.53, subdivision (f).

11

commit a violent injury on the person of another.' " (*People v. Morgan* (2026) 19 Cal.5th 132, 138-139 (*Morgan*); § 240.)  "Assault does not require a showing of specific intent.  [Citation.]  Instead, assault requires only that the act itself was intentional, and that the would-be assaulter was aware that his or her conduct would probably and directly result in violent injury."  (*Morgan*, at p. 139.)  An aggravated form of assault occurs when a person commits an assault "with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer … engaged in the performance of his or her duties, when the peace officer … is engaged in the performance of his or her duties."  (§ 245, subd. (d)(2).)

"Under the Evidence Code, all relevant evidence is admissible unless prohibited by statute.  [Citation.]  ' "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." '  [Citation.]  But under Evidence Code section 352, the trial court retains the discretion to exclude relevant evidence if 'its probative value is substantially outweighed by the probability that its admission will' either 'necessitate undue consumption of time' or 'create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  'We review a trial court's decision to admit or exclude evidence 'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' [Citation.]  When evidence is erroneously

12

admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error.' " (*People v. Young* (2019) 7 Cal.5th 905, 930-931.)

B. *Application*

Here, defendant asserts the trial court erred by admitting evidence of his tattoos in violation of Evidence Code sections 1101 and 352. We need not address these claims of error in detail because we conclude that even assuming defendant preserved his objection for appellate review[5] and, even assuming the trial court should have excluded the evidence, defendant has failed to show prejudice warranting reversal.

In this case, defendant admitted that: he knew J.M. had called 911 to summon law enforcement to the area; he fired his gun at sheriff's deputies conducting a traffic stop on the street outside the apartment; he observed the sheriff's deputies react to the gunfire; he heard a law enforcement helicopter circle overhead within 30 minutes; and he fired his gun upon seeing a shadow outside the window of the apartment shortly thereafter. A neighbor testified that sheriff's deputies were easily identifiable by their uniforms while

---

[5] Our review of the record shows that defendant objected to the admission of evidence of his tattoos based only on Evidence Code section 352. During the colloquy and argument on this issue, there was no mention of Evidence Code section 1101, and the argument centered only on whether the evidence was relevant to a contested issue in the case. Generally, an objection that evidence is irrelevant and unduly prejudicial under Evidence Code section 352 is insufficient to preserve for appeal a claim that evidence was inadmissible as improper propensity evidence under Evidence Code section 1101. (*People v. Valdez* (2012) 55 Cal.4th 82, 130; *People v. Doolin* (2009) 45 Cal.4th 390, 437.)

in the courtyard of the apartment complex, and defendant previously admitted he knew law enforcement officers had entered the apartment complex, had seen law enforcement officers in the courtyard (albeit as part of a "mob"), had observed persons with flashlights, and had heard voices over a radio outside the apartment prior to shooting. Finally, the jury heard testimony and reviewed video evidence that depicted sheriff's deputies performing a knock and announce procedure immediately before defendant fired his gun.

Admission of evidence regarding tattoos, even if erroneous, is harmless where substantial other evidence that would establish the same fact is properly admitted. (*People v. Medina* (1995) 11 Cal.4th 694, 749-750.) And, in our view, the evidence described above was overwhelming evidence in support of every element necessary to convict defendant of a violation of section 245, subdivision (d)(2).

On appeal, defendant concedes that the evidence in support of his conviction was essentially undisputed at trial. Nevertheless, defendant contends that the tattoo evidence was prejudicial because "[t]he only real issue in this case was whether [defendant] knowingly fired at a deputy," and his credibility was of "crucial importance" to that issue. We are unpersuaded by this argument.

First, there was already significant evidence undercutting defendant's credibility as a witness on the issue of whether he knowingly fired at a deputy. The jury was presented with defendant's prior contradictory interview statements in which defendant admitted knowing that law enforcement personnel were in the apartment complex; admitted seeing flashlights, and admitted hearing what he thought were law enforcement

14

personnel speaking over the radios outside his apartment. Defendant further admitted in his own testimony at trial that he had committed multiple prior felonies and had previously been involved in a scheme to sell illicit drugs. Finally, defendant openly claimed to be under the influence of methamphetamine at the time of the incident. Given the significant evidence suggesting defendant would not be a credible witness, defendant has not shown that admission of evidence related to his tattoos made any significant impact on the jury's determination of whether defendant was a credible witness.

Second, and more importantly, defendant's credibility as a witness was not central to his conviction on count 2. Generally, "assault does not require a specific intent to injure the victim." (*People v. Williams* (2001) 26 Cal.4th 779, 788.) Instead, " 'the test for assault is whether a reasonable person, viewing the facts known to [the defendant], would find that the act in question would directly, naturally, and probably result in physical force being applied to another.' " (*People v. Cruz-Partida* (2022) 79 Cal.App5th 197, 207.) Similarly, the knowledge element of section 245, subdivision (d), requires a showing that the defendant "knows *or reasonably should know* that the victim is a peace officer." (§ 245, subd. (d)(2), italics added.) "The term 'reasonably should have known'… implicates an objective criminal negligence standard." (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 230.) As such, section 245, subdivision (d), does not require a subjective intent to direct the assault at a peace officer (see *People v. Perez* (2010) 50 Cal.4th 222, 233-234) and does not require actual knowledge that the victim is a peace officer (*People v. Whalen* (1973) 33 Cal.App.3d 710, 717; *People v. Finney* (1980) 110 Cal.App.3d 705, 713-714). A conviction requires only evidence of "such

15

circumstances that a reasonable person would know that the victim is a police officer engaged in the performance of his duties." (*People v. Gaines* (1966) 247 Cal.App.2d 141, 145 [interpreting identical language in former version of statute].)[6]

Thus, unlike the charge of premeditated attempted murder alleged in count 1, the question of whether defendant had actual knowledge that the victim was a peace officer or whether defendant subjectively intended to shoot at a peace officer were not crucial to his conviction on count 2. Even if the jury was to find defendant completely credible regarding his subjective intent, the jury would still be required to convict defendant on count 2 if the evidence established that a reasonable person under the circumstances should have known that the victim was a peace officer performing his duties. The fact defendant did not or was unable to appreciate what a reasonable person would have appreciated under the same circumstances does not negate any element of the offense.[7]

A reasonable person would expect sheriff's deputies to respond after being shot at while conducting a traffic stop on a public street; would expect that sheriff's deputies

---

[6] This interpretation is consistent with the same language used in other statutes. (See *People v. Midell* (2025) 113 Cal.App.5th 1060, [Battery against a custodial officer under section 243.1 requires only constructive knowledge of victim's status as a custodial officer based upon objective standard.]; *People v. Sifuentes*, *supra*, 83 Cal.App.5th at p. 230 [interpreting similar language in section 189, subdivision (f)].)

[7] Generally, "[w]hen an 'objective standard' applies, an individual's failure or inability to act reasonably, due to deficient 'reasoning ability' or a mental illness, is irrelevant and inadmissible." (*People v. Mackreth* (2020) 58 Cal.App.5th 317, 336.) This principle has been specifically applied in situations involving assaults in which the aggravating factor is the victim's identity as a peace officer. (*People v. Parks* (1971) 4 Cal.3d 955, 960; *Whalen*, *supra*, 33 Cal.App.3d at p. 717.)

16

would seek to question the occupants of the building where those shots emanated; would understand a search was still in process when hearing a police helicopter circling overhead; and would expect deputies to eventually come to the apartment door under the circumstances. Defendant's credibility as a witness had no bearing on these facts because defendant did not dispute, and instead admitted, each of these underlying facts in his testimony at trial. On this record, defendant has not established that a jury would have reached a different conclusion had evidence of defendant's tattoos been excluded.

Given the overwhelming and undisputed evidence in the record and the fact that defendant's credibility had little bearing on the specific conviction for violation of section 245, subdivision (d)(2), defendant has not shown a reasonable probability of a more favorable outcome had the challenged evidence of his tattoos been excluded. And absent prejudice, reversal is not warranted.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

CODRINGTON
Acting P. J.

MENETREZ
J.

17